Nos. 25-1555 through 25-1578; 25-1580 through 25-1593;
25-1676; and  25-1677 (Consolidated)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

ATLAS DATA PRIVACY CORP., AS ASSIGNEE OF INDIVIDUALS WHO ARE
COVERED PERSONS; JANE DOE 1, A LAW ENFORCEMENT OFFICER; JANE DOE 2, A
LAW ENFORCEMENT OFFICER; EDWIN MALDONADO; SCOTT MALONEY;
JUSTYNA MALONEY; PATRICK COLLIGAN;
PETER ANDREYEV; AND WILLIAM SULLIVAN,

PLAINTIFFS-APPELLEES,

*v.*

WE INFORM LLC, ET AL.

DEFENDANTS-APPELLANTS.

On Appeal from the Order and Memorandum of the United States District
Court for the District of New Jersey dated November 26, 2024

## BRIEF OF *AMICI CURIAE*
## CONSUMER DATA INDUSTRY ASSOCIATION,
## SOFTWARE & INFORMATION INDUSTRY ASSOCIATION, AND
## COALITION FOR SENSIBLE PUBLIC RECORDS ACCESS
## IN SUPPORT OF DEFENDANT-APPELLANTS' APPEAL

JENNIFER L. SARVADI
ROBERT D. TILLEY (*admission application pending*)
HUDSON COOK, LLP
1909 K Street, NW, 4th Floor
Washington, DC 20006
(202) 715-2002
jsarvadi@hudco.com
*Attorneys for Amici Curiae*
*Consumer Data Industry Association*
*Software & Information Industry Association*
*Coalition for Sensible Public Records Access*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................i

TABLE OF AUTHORITIES ............................................................ ii

STATEMENT OF INTEREST OF AMICUS CURIAE ......................................1

ARGUMENT ...............................................................................3

    I.    The U.S. Economy Depends on Accurate and Reliable Data. .............5

    II.   Daniel's Law is Unconstitutional Because it is Not Appropriately Tailored. ...................................................................................8

        A.  The District Court Erroneously Created and Applied a New Standard of Review that Did Not Evaluate Whether Daniel's Law is Overinclusive. ................................................................8

        B.  The New Jersey Legislature Intended Daniel's Law to Protect the Safety and Security of Public Officials in the Justice System.......................................................................10

        C.  Daniel's Law Fails Because it is Overinclusive. ..........................13

        D.  Daniel's Law Fails Because it is Underinclusive. .......................19

CONCLUSION ..........................................................................22

CERTIFICATE OF COMPLIANCE .................................................23

CERTIFICATE OF SERVICE .......................................................24

i

# TABLE OF AUTHORITIES

## Cases

*Central Hudson Gas & Electricity Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980) .......................................................................10

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) ........................................ 20, 21

*Howard v. Criminal Info. Svc.*, 654 F.3d 887 (9th Cir. 2011). ...................7

*NASA v. Nelson*, 562 U.S. 134 (2011) .........................................................7

*Nat'l Aeronautics & Space Admin v. Nelson*, 562 U.S. 134 (2011) ...........7

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ........................................9

*U.S. West, Inc. v. FCC*, 182 F.3d 1224 (10th Cir. 1999) ..........................11

## Statutes

15 U.S.C. § 1681t(b) ...................................................................................17

15 U.S.C. § 1684 *et seq* .............................................................................14

15 U.S.C. § 6801 *et seq* .............................................................................14

N.J. Stat. Ann. § 56:8-166.1 .......................................................................18

N.J. Stat. Ann. § 56:8-166.10 .....................................................................12

N.J. Stat. Ann. § 56:8-166.12 .....................................................................12

N.J. Stat. Ann. § 56:8-166.13 .....................................................................18

N.J. Stat. Ann. § 56:8-166.15 .....................................................................19

N.J. Stat. Ann. § 56:8-166.3 .......................................................................11

N.J. Stat. Ann. § 56:8-166.4 .......................................................................12

## Other Authorities

Comments of Gail H. Littlejohn, Vice President, Gov't Affairs, & Steven M. Emmert, Dir., Gov't Affairs, Reed Elsevier Inc., LEXIS-NEXIS Group (Mar. 31, 2000), *available at* http:// www.sec.gov/rules/proposed/s70600/littlej1.htm ...........................................7

Departments of Commerce, Justice, and State, the Judiciary, and Related
Agencies Appropriations for Fiscal Year 2000: Hearings on H.R.
2670/S.1217 Before Subcomm. for the Dep'ts of Commerce, Justice,
and State, the Judiciary, and Related Agencies of the S. Comm. on
Appropriations, 106th Cong. 280 (1999) ........................................................6

Robert M. Jarvis, John B. West: Founder of the West Publishing Company,
50 Am. J. Legal Hist. 1 *5 (2010) ...................................................................5

## Rules

12 C.F.R. § 1022.123 ...............................................................................................16

16 C.F.R. § 313.15 .................................................................................................15

16 C.F.R. § 681 ......................................................................................................16

Federal Rule of Appellate Procedure 29 ....................................................................1

The Consumer Data Industry Association, the Software & Information Industry Association, and the Coalition for Sensible Public Record Access respectfully submit this brief in support of the appeal by consolidated Defendants-Appellants, We Inform, LLC, *et al.*, of the decision of the district court denying the Defendants' consolidated motion to dismiss.

## **STATEMENT OF INTEREST OF AMICUS CURIAE**

The Consumer Data Industry Association ("CDIA"), the Software & Information Industry Association ("SIIA"), and the Coalition for Sensible Public Record Access ("CSPRA", together with SIIA and CDIA, "*Amici*") jointly submit this *amicus* brief on behalf of their members, all of whom are actively engaged in the consumer data industry.[1]  CDIA is a trade association representing consumer reporting agencies ("CRAs"), including the nationwide credit bureaus, regional and specialized credit bureaus, and background check and residential screening companies around the world.  Founded in 1906, CDIA promotes the responsible use of consumer data to help consumers achieve their financial goals and to help businesses, governments, and volunteer organizations avoid fraud and manage risk.  Through data and analytics, CDIA members empower economic opportunity,

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* represent that no party or party's counsel has authored this brief, in whole or in part, or contributed money intended to fund the preparation or submission of this brief.  Further, no person other than *Amici* and their non-party members contributed money that was intended to fund the preparation or submission of this brief.

thereby helping to ensure fair and safe transactions for consumers and facilitating consumers' access to financial and other products suited to their unique needs.

SIIA is a leading trade association for software companies and those in the business of information. SIIA represents more than 350 member companies, among them publishers of software and information products, including databases, enterprise and consumer software, and other products that combine information with digital technology. SIIA member companies serve nearly every segment of society, including business, education, government, healthcare, and consumers. SIIA is dedicated to creating a healthy environment for the creation, dissemination, and productive use of information. Many of its members rely on access to public records.

CSPRA is a non-profit organization dedicated to promoting the principle of open public record access to ensure individuals, the press, advocates, and businesses have the continued freedom to collect and use the information made available in the public record for personal, governmental, commercial, law enforcement, and societal benefit. Members of CSPRA are among the many entities that comprise a vital link in the flow of information for these purposes and provide services that are widely used by constituents in every state. Collectively, CSPRA members employ more than 75,000 persons across the U.S. The economic and societal activity that relies on entities such as CSPRA members is valued in the trillions of dollars and employs millions of people.

Collectively, *Amici*'s members are information solutions providers, credit bureaus, and data analytics firms who collect and add value to lawfully acquired, accurate information that is widely available in private hands. The freedom to collect and use this data is a fundamental free speech activity, and the core of the constitutionally protected public domain. *Amici* offer this brief to explain the ways that these services are impacted by the unconstitutional overbreadth of Daniel's Law. *Amici* are uniquely qualified to assist this Court in understanding these impacts on the U.S. credit reporting ecosystem, the identity theft protection industry, and the larger U.S. economy.

## ARGUMENT

The district court held—for the first time—that the government may prohibit and even criminalize the use and disclosure of accurate, lawfully-acquired information that is widely available in private hands and available from the government itself through public records. *See* November 27, 2024 Memorandum Opinion ("Memo."). It did so on the basis that this information may be misused to commit serious crimes or that it was invasive of personal privacy. *Amici* do not dispute that the government has a compelling interest in protecting the safety of public officers in the judicial system or that the government has the power to do so through an appropriately tailored statute. As with most First Amendment cases, this dispute centers on the means the government has selected.

3

Daniel's Law is written to prohibit not only the sharing of information to third parties, who pose a real risk to the physical safety of covered persons, but even the retention and storage of such information by companies with lawful business needs for it.  Daniel's Law also criminalizes the disclosure of accurate information—an extraordinary infringement on free speech.

The district court's review of Daniel's Law failed in three major respects.[2] First, as a content-based restriction on speech, Daniel's Law is subject to strict scrutiny review.  The district court erred in refusing to apply strict scrutiny, as required by binding Supreme Court precedent.  Second, the district court erred by failing to examine the ways in which Daniel's Law is overinclusive.  Third, the district court failed to meaningfully consider the ways that Daniel's Law is underinclusive.  For all of the reasons explained in Appellants' Brief, and as stated herein, this Court should correct these errors and hold that Daniel's Law facially violates the First Amendment.

*Amici* submit this separate *amicus* brief (1) to explain the deleterious effects that flow from the overbreadth of Daniel's Law to *Amici's* members, and by extension to businesses and consumers across the country; (2) to explain that the law fails to further the New Jersey legislature's interest, despite its negative

---

[2] *Amici* generally agree with, and endorse, the arguments in Appellants' opening brief.  *See* Joint Brief of Appellants, ECF No. 27 in Case No. 25-1555 ("Appellants' Brief").

consequences on *Amici's* members, because it is substantially underinclusive; and (3) to provide additional support for Appellants' legal arguments.

## I.    The U.S. Economy Depends on Accurate and Reliable Data.

Today, the U.S. economy depends on the fast and accurate transmission of information made available by all players in the data and information industries, as described above.  Participants in these industries collect information from a myriad of sources including (1) government agencies who publicly share court and other agency records (*e.g.*, from departments of motor vehicles, departments of corrections, real property records),[3] (2) individuals who have made their content available voluntarily (whether online or otherwise), and (3) furnishers of information to consumer reporting agencies, like lenders, and other third-party sources.  Many of the users are licensed or otherwise regulated closely at both the state and federal level.  The customers of *Amici's* members who use this data are both private-sector companies and government entities, including law enforcement agencies.

The real value in the data services *Amici* provide extends far beyond economic impacts to our core needs as a civilized, functioning society.  Users of this information—including consumers' home addresses and phone numbers—need

---

[3] While data sharing is ubiquitous in the modern economy, it has been commonplace for most of modern history.  For example, courthouse records have been commercially collected and published for nearly 150 years.  *See* Robert M. Jarvis, *John B. West: Founder of the West Publishing Company*, 50 Am. J. Legal Hist. 1 *5 (2010).

timely and efficient access to this data for a variety of purposes including, but not limited to:

- **Law enforcement.** Federal and local law enforcement agencies rely on home address and phone number information to locate suspects of criminal activity, as well as victims and witnesses to crimes. Agencies like the Federal Bureau of Investigation rely on private and public sources of data because they "[allow] FBI investigative personnel to perform searches from computer workstations and eliminate[] the need to perform more time-consuming manual searches of federal, state, and local records systems, libraries, and other information sources."[4]

- **Fraud prevention.** Identity theft and other forms of fraud are a constant threat to consumers and businesses alike. Companies often leverage data, including home addresses and phone numbers, to verify consumers' identities to prevent identity theft and fraud. This can include an insurance company obtaining data from public records, or a vendor reselling the same, in order to verify a consumer's true identity and mitigate its risk. For consumers with little or no credit histories, the only viable approach is often to ask "out of wallet" questions, which a fraudster would be unlikely to know, such as the very information at issue here (*e.g.*, "which of the following five addresses is a past home address of yours?").

- **Child support enforcement.** State and local agencies use data like home addresses and phone numbers to locate individuals who are delinquent in paying their child support obligations. The Association for Children for Enforcement of Support reports that public record information provided through commercial vendors helped locate more than 75 percent of the "deadbeat parents" they sought.[5]

---

[4] Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for Fiscal Year 2000: Hearings on H.R. 2670/S.1217 Before Subcomm. for the Dep'ts of Commerce, Justice, and State, the Judiciary, and Related Agencies of the S. Comm. on Appropriations, 106th Cong. 280 (1999).

[5] Comments of Gail H. Littlejohn, Vice President, Gov't Affairs, & Steven M. Emmert, Dir., Gov't Affairs, Reed Elsevier Inc., LEXIS-NEXIS Group (Mar. 31, 2000), *available at* http:// www.sec.gov/rules/proposed/s70600/littlej1.htm; *see also*

- **Credit extensions.**  Consumer credit decisions rely on accurate header information—including names, addresses, and even phone numbers—to accurately match data to the right individuals. Reliable and prompt access to such data is necessary to facilitate an active and competitive credit market, and to facilitate creditors' securitization of collateral in support of such credit extensions.

- **Insurance.**  Insurers of all shapes and sizes access such data each day to underwrite policies and to pay claims.

- **Product safety.**  Manufacturers use name and address information to provide important safety recall and service information to customers.

- **Tax compliance.**  Governments use name, address and phone number information from both private and public sources to detect tax avoidance and to pursue offenders.

- **Government benefits.**  Government agencies use home address and phone number information to verify eligibility for, and prevent fraud related to, government benefits.

- **News-gathering and publishing.**  Newspaper companies regularly obtain addresses and phone numbers to report on crimes, detect possible corruption or conflicts of interest, and publish stories involving the operation or safety of motor vehicles.[6]

- **Employment and tenant screening.**  Many consumer reporting agencies use data impacted by Daniel's Law to prepare consumer reports for employment and tenant screening, helping employers and others ensure a "competent, reliable workforce."[7]

---

*Financial Information Privacy Act: Hearings on H.R. 4321 Before the H. Comm. on Banking and Financial Services*, 105th Cong. 100 (1998) (statement of Robert Glass).

[6] *See Howard v. Criminal Info. Svc.*, 654 F.3d 887, 889 (9th Cir. 2011).

[7] *Nat'l Aeronautics & Space Admin v. Nelson*, 562 U.S. 134, 150 (2011).

Users depend on timely access to this information, and its predictable transmission forms the backbone of commerce across the country, improving consumers' everyday lives. Loss of such valuable information would have serious consequences, including for the intended beneficiaries of Daniel's Law.

## II.    Daniel's Law is Unconstitutional Because it is Not Appropriately Tailored.

### A.    The District Court Erroneously Created and Applied a New Standard of Review that Did Not Evaluate Whether Daniel's Law is Overinclusive.

*Amici* agree with Appellants that Daniel's Law is subject to strict scrutiny and fails because it is not narrowly tailored to further New Jersey's articulated interest. The district court correctly began its analysis by holding that the types of expression governed by Daniel's Law—disclosures of home addresses and phone numbers— are not commercial speech. Memo. at 21-22. The court also correctly held that Daniel's Law is a content-based restriction on speech. Memo. at 22-23.

The district court then erred when it determined that Daniel's Law need not be analyzed under the strict scrutiny standard, because—according to the district court—Daniel's Law falls into a category of "privacy law[s]" that are exempt from strict scrutiny. Memo at 25, 28. In doing so, the district court inappropriately created and applied a new, less rigorous, standard to evaluate whether Daniel's Law violates the First Amendment. As a result, the district court evaluated only whether Daniel's

Law is underinclusive in furthering the state's identified interest, and not whether Daniel's Law is overinclusive. *See* Memo. at 28, 30-33.

Appellants ably explained that there is no exception to the requirement that content-based restrictions on speech must be evaluated under strict scrutiny. Appellants' Brief at 41-44. Indeed, *Amici* are not aware of any precedent suggesting that the appropriate level of judicial scrutiny is determined by the nature of the state's interest underlying the legislation rather than by the nature of the limitation imposed on free speech. *See id.* at 41-42.

In addition to the reasoning set out by Appellants, *Amici* note that the Supreme Court has foreclosed the argument that laws intended to protect privacy interests are subject to the district court's less-exacting form of judicial review. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557, 569-570 (2011) (assuming for purposes of the analysis that "safeguard[ing] medical privacy" was a significant state interest). Once the district court determined that Daniel's Law is a content-based restriction on speech, it was bound to evaluate whether the law is sufficiently tailored to the state's interests. That is the unavoidable conclusion to be drawn from *Sorrell*, in which the Supreme Court applied "heightened scrutiny" to a "content-based" state "privacy law." *Id.* at 565-66. In *Sorrell*, the Court held that the law was unconstitutional because it was not sufficiently "drawn to serve the State's asserted interest" even under the Court's less-exacting test for commercial speech. *See Sorrell*, 564 U.S. at

571-72    (citing *Central Hudson Gas & Electricity Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980)).

The district court erred, therefore, when it evaluated Daniel's Law under an even *less rigorous* standard that ignored the law's facial overbreadth.

**B.    The New Jersey Legislature Intended Daniel's Law to Protect the Safety and Security of Public Officials in the Justice System.**

The district court took judicial notice of "the tragic circumstances that led to the passage of Daniel's Law" and the New Jersey legislature's articulated interest in passing the law.  Memo. at 12-13.  The law is named for the deceased son of Judge Esther Salas, who was fatally shot at her home in New Jersey.  *Id.* at 12.  The district court found that the New Jersey legislature passed Daniel's Law "in response to these crimes."  *Id.*  The district court's opinion included a lengthy quote from the New Jersey legislature's explicit statement of purpose in passing Daniel's Law:

> This act shall be liberally construed in order to accomplish its purpose and the public policy of this State, which is <u>to enhance the safety and security</u> of certain public officials in the justice system, including judicial officers, law enforcement officers, child protective investigators[,] . . . and prosecutors, who serve or have served the people of New Jersey, and the immediate family members of these individuals, <u>to foster the ability</u> of these public servants who perform critical roles in the justice system <u>to carry out their official duties without fear of personal reprisal</u> from affected individuals related to the performance of their public functions.

*Id.* at 13 (quoting N.J. Stat. Ann. § 56:8-166.3(a) (emphasis added by the district court)).

*Amici* concede that New Jersey has a compelling state interest in protecting "the safety and security of [] public officials in the justice system" and their immediate family members, and that the New Jersey legislature intended Daniel's Law to further that interest. *See* N.J. Stat. Ann. §§ 56:8-166.3(a). However, the district court did not evaluate whether Daniel's Law is sufficiently tailored to this purpose.

Instead, the district court characterized Daniel's Law as a "privacy law," because it provides covered persons with "the right to be let alone insofar as their home addresses and unpublished phone numbers are concerned." Memo. at 25. The district court interpreted covered persons' interest in being free from "personal reprisal" as "analogous to the long-standing common law tort for invasion of privacy for disclosure of the intimate details of a person's private life. There the law allows for damages for disclosure of such information in order to compensate for causing **embarrassment and humiliation**." *Id.* (emphasis added).

This analysis goes too far—protection from physical threats and personal embarrassment are not the same interest. *See U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1234-35 (10th Cir. 1999) (warning that courts must "pay particular attention to attempts by the government to assert privacy as a substantial state interest," due to the "breadth of the concept of privacy"). Nothing in the legislative history or public record suggests that Daniel's Law allows covered persons to keep their addresses

11

and phone numbers confidential to avoid "embarrassment or humiliation." Certainly, the legislature intended for covered persons to be "let alone" in their homes, but for the purpose of protecting against threats to their safety and security. *See U.S. West*, 182 F.3d at 1234 ("the government cannot satisfy the second prong of the *Central Hudson* test by merely asserting a broad interest in privacy . . . [but rather] must specify the particular notion of privacy and interest served").

Further evidencing that Daniel's Law is not about the general right to privacy, the New Jersey legislature recently passed a statutory framework to protect individuals' data privacy rights with the enactment of Senate Bill 332 ("New Jersey Privacy Law").[8] Effective January 15, 2025, the New Jersey Privacy Law sets forth a comprehensive privacy regime for consumers, implementing a tiered approach to privacy based upon the types of personal data collected and the uses of such data. New Jersey consumers have the right to know what personal data businesses process about them, correct inaccuracies, and delete certain data, as well as to opt-out of certain uses the legislature decided warranted greater protection: targeted advertising, sales of personal data, and profiling in furtherance of decisions that produce significant legal effects.[9] Certain categories of "sensitive data" receive an especially high degree of protection.[10]

---

[8] N.J. Stat. Ann. §§ 56:8-166.4 - 166.19.
[9] N.J. Stat. Ann. § 56:8-166.10(a).
[10] N.J. Stat. Ann. § 56:8-166.12(a)(4).

In contrast to this comprehensive data privacy framework, Daniel's Law is crafted to serve not general privacy interests but rather the protection of covered persons' physical safety.  Evaluated against that state interest, the law is facially overbroad and fails strict scrutiny.  Similarly, Daniel's Law would fail even under intermediate scrutiny, which "requires [the Court] to decide if the restriction [on speech] is nevertheless more extensive than necessary to serve the government's substantial interest."  *Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 140 (3d Cir. 2020) (citing *Central Hudson*, 447 U.S. 557 (1980)).

### C.    Daniel's Law Fails Because it is Overinclusive.

Daniel's Law provides that "not later than 10 business days following receipt [of notification from a covered person], a person, business, or association shall not disclose or re-disclose on the Internet or otherwise make available, the home address or unpublished home telephone number of any covered person."  N.J. Stat. Ann. § 56:8-166.1(a).  The statute defines "disclose" to mean "to solicit, sell, manufacture, give, provide, lend, trade, mail, deliver, transfer, post, publish, distribute, circulate, disseminate, present, exhibit, advertise, or offer, and shall include making available or viewable within a searchable list or database, regardless of whether a search of such list or database is actually performed."  N.J. Stat. Ann. § 56:8-166.1(d).

13

Appellants' brief summarizes numerous ways in which Daniel's Law is overinclusive, in that it prohibits many types of disclosure that pose little risk to the physical safety of covered persons. Appellants' Brief at 25-31. By contrast, the district court's analysis concerning whether Daniel's Law is overly-broad, or overinclusive, consisted of the following three sentences:

> Defendants also argue that the definition of "disclose" is too broad. The law reads as it does to advance the state's significant interest in protecting the lives and well-being of covered persons. This argument is not persuasive.

Memo at. 33-34. The court failed to analyze the scope of the definition of "disclose" or the resulting consequences. A careful review of the broad text and sweeping implications of this law makes clear that it is not tailored in **any** meaningful way.

In addition to the types of disclosures identified in Appellants' Brief, Daniel's Law is overinclusive because it prohibits (1) business-to-business disclosures, and (2) purely internal maintenance and storage of the relevant data.

**Business-to-business disclosures.** The plain meaning of Daniel's Law squarely prohibits business-to-business transfers of covered persons' information, yet it provides no exceptions for data sharing expressly authorized by federal and state laws, such as the Fair Credit Reporting Act, 15 U.S.C. § 1684 *et seq.* ("FCRA"), the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq.* ("GLBA"), and the Drivers Privacy Protection Act, 18 U.S.C. § 2721 *et seq.* ("DPPA"). Consistent with, and as expressly provided for by such laws, *Amici's* members make data available to

businesses that pose no safety risk to covered persons.  In accordance with these laws, *Amici's* members impose contractual limitations, and terms of use, on their customers to establish the permitted—and prohibited—uses of this information and to limit the rights of users to further share the information.

This issue is paramount for *Amici* and their members. Many of the fraud prevention and identity verification products discussed in Section I, above, are built upon the lawful sharing of information between businesses as contemplated and expressly authorized by these federal laws.  For example, the GLBA and corresponding federal regulations created a specific mechanism for the disclosure of nonpublic personal information to "protect the confidentiality or security" of the company's records, or "to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability."  16 C.F.R. § 313.15(a)(2). Under these provisions, providers of fraud prevention tools share name, address, and phone number information with their customers.  Similarly, the DPPA provides for several categories of permissible disclosures, including "to verify the accuracy" of information submitted by an individual, "for the purposes of preventing fraud," and for use by insurers in connection with claims and investigations.  18 U.S.C. § 2721(b)(3),(6).

These fraud prevention tools are not only a good idea; they are often legally required.  By way of example, the FTC's Identity Theft Rules, created under

authority granted by the FCRA, require financial institutions to develop, implement, and administer an anti-identity theft program to identify and prevent identity theft and consumer fraud. *See* 16 C.F.R. § 681.1. Businesses rely on *Amici's* members to provide them with the necessary tools to implement and administer these red flag policies (and, similarly, anti-money laundering programs)—to the benefit of consumers and business alike. Address and phone number information are *particularly* useful to identify and prevent potential identity theft, a growing national threat to consumers. Yet, Daniel's Law is written to prevent the lawful maintenance and use of this information for these purposes.

In addition, a great deal of activity governed by the FCRA could be deemed an impermissible disclosure under Daniel's Law. For example, the prohibition on disclosure of home addresses and phone numbers may prohibit creditors from furnishing accurate account information to consumer reporting agencies for the purpose of being included in consumer reports. Consumer reporting agencies use address and phone number information to verify identities and accurately match records to a particular consumer. *See, e.g.*, CFPB Advisory Opinion on Name-Only Matching Procedures, 12 CFR Part 1022 (explaining that "a consumer reporting agency that uses . . . name only matching . . . is not using reasonable procedures to assure maximum possible accuracy"); *see also* 12 C.F.R. § 1022.123(b)(1) (identifying "current and/or recent full address" as information that may "constitute

reasonable information requirements for proof of identity).[11] The companies that furnish this information to the consumer reporting agencies are the first line of defense in assuring the accuracy of consumer report information.

If companies are prohibited from furnishing to consumer reporting agencies full and accurate identifying information in connection with account histories, New Jersey covered persons will be harmed. If a furnisher must suddenly cease reporting the identity information, they will no longer be permitted to furnish a payment history on a credit account. Consider an individual whose credit score was considered "high" based on a longstanding positive account payment history reflecting on their report, such as their mortgage payment history. If that information were suddenly deleted or unavailable, the consumer's credit score would likely fall as a result of the loss of a longstanding positive payment record. This, in turn, could reduce covered persons' access to credit on the best terms available to them.

**Internal records maintained by *Amici's* members.** Daniel's Law not only prohibits the sharing of information between entities, it also prohibits reasonable internal use by the entities that have collected it, making daily operations for many businesses nearly impossible and rendering the law *facially* overinclusive. Under the express terms of the statute, even the original collectors of information may be

---

[11] Note also that, to the extent Daniel's Law regulates the contents and disclosure of the consumer files maintained by consumer reporting agencies, it is likely preempted by the FCRA. *See, e.g.*, 15 U.S.C. § 1681t(b).

prohibited from storing covered persons' information within wholly-internal business records that are comprised of "searchable list[s] or database[s]." N.J. Stat. Ann. § 56:8-166.1(d). Notably, this statutory language speaks to the way that the information is maintained and stored, rather than limiting its disclosure to third parties ("regardless of whether a search of such list or database is actually performed"). *Id.* This regulation on *maintaining* information—rather than the disclosure of information—illustrates the law's overbreadth because it is not related to any activity that could promote covered persons' physical safety.[12]

Compare Daniel's Law's overly broad definition of "disclose" and its implications to the reasoned approach taken by the New Jersey Legislature in enacting the New Jersey Privacy Law. The New Jersey Privacy Law expressly contemplates and facilitates certain uses of data in recognition of the important role data plays in the economy, exempting from the law's ambit, among other things: (1) financial institutions or data regulated by the GLBA; and (2) personal data collected, processed, sold, or disclosed by a consumer reporting agency regulated by the FCRA.[13] Unlike Daniel's Law, the New Jersey Privacy Law engages with

---

[12] *Amici* are not aware of any threats to the safety of covered persons that have resulted from the storage of home address or phone number information in the companies' **internal databases**.

[13] N.J. Stat. Ann. § 56:8-166.13. The legislature also clarified that nothing in the law should prevent a data processor's ability to comply with other laws, provide products

federal regulations and presents a comprehensive framework that balances privacy interests against the legitimate and necessary uses of personal data.

### D.    Daniel's Law Fails Because it is Underinclusive.

The district court failed to grapple with the ways that Daniel's Law is woefully underinclusive.  In preface to its analysis, the district court recited the New Jersey legislature's declared purpose in enacting Daniel's Law:  "to enhance the safety and security of judges, prosecutors, and other law enforcement officers so that they are able to carry out their official duties without fear of personal reprisal."  Memo. at 29.  The court also took judicial notice of "an ever increasing number of threats and even assassinations," including the tragic death of Judge Esther Salas's son.  *Id.*  Given these stakes, and the real harms to commercial activity that will result from the prohibition on disclosure of covered persons' home addresses and phone numbers (discussed above in Sections I and II(B)), it is remarkably important that Daniel's Law actually advance the state's interest "in protecting judges, prosecutors, and other law enforcement officers from threats and assassinations"—*i.e.*, that it not be underinclusive.  Memo. at 30.

Against this background, the district court's analysis of whether Daniel's Law is underinclusive—whether it actually furthers its important goals—was insufficient.

---

or services requested by a consumer, and prevent, detect, or respond to fraud and identity theft.  N.J. Stat. Ann. § 56:8-166.15(a).

*See Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (the "facial underinclusiveness" of the law raised serious doubts about whether it furthered the significant interests invoked to justify it). The district court acknowledged that "Daniel's Law has a number of exemptions allowing for disclosure of home addresses," including those that "appear on property records or on voter registration lists." Memo. at 30. Citing a case from 1989, the district court reasoned that "this type of information is generally more difficult to extract from public records than information found on the Internet." *Id.* However, the court provided no support for its assumption that Appellants, and *Amici's* members, make their records more readily available online to be searched by the general public than are the exempted public records. It is fact, however, that several New Jersey counties make their property records electronically searchable online.[14]

Appellants highlight several ways in which Daniel's Law is underinclusive. The two most important are that (1) covered persons may demand that companies

---

[14] *See, e.g.*, Bergen County Cleark's Office Public Search (including name-based searching), available at https://bclrs.co.bergen.nj.us/browserview/; Middlesex County Clerk Land Records Search (including name-based searching), available at https://mcrecords.co.middlesex.nj.us/recordssearch/; Essex County's Public Records Electronic Search System, available at https://press.essexregister.com/prodpress/index.aspx; Monmouth County's Open Public Records Search System, available at https://oprs.co.monmouth.nj.us/oprs/googlewithuc/default.aspx. While not all of these websites allow for name-based searching, that is also true for the public-facing sites offered by many of *Amici*'s members.

remove their information while also voluntarily disclosing the information on the internet; and (2) covered persons may seek large statutory damages from companies while not being required to request that the state remove their information (or even having the right to demand removal from state databases). *See* Appellants' Brief at 32-26. These disclosures of the information are exceptions that effectively swallow the rule and render Daniel's Law an unconstitutional infringement on free speech.[15]

*Amici's* members are injured by the law's under-inclusiveness because the law favors certain holders of information, and their preferred uses of such information, over theirs. The State's various agencies are allowed to share with the general public the very same information that *Amici's* members must destroy upon request, regardless of their own need for the information. "When a State attempts the extraordinary measure of punishing truthful publication in the name of privacy, it must demonstrate its commitment to advancing this interest by applying its prohibition evenhandedly, to the smalltime disseminator as well as the media giant." *Florida Star*, 491 U.S. at 540. By striking the law as written, and requiring the New Jersey legislature to address these shortcomings, the Court can ensure that covered persons receive effective protection from threats to their physical safety.

---

[15] CSPRA has previously published an article summarizing the shortcomings of address suppression strategies and suggesting alternative approaches, available here: https://static1.squarespace.com/static/645bb7ff3b387d6a11bb729d/t/66e3338ffa06 1600ac33b924/1726165905719/CSPRA+Security+Article+Final4.pdf.

## <u>CONCLUSION</u>

For the reasons above, the Court should vacate the order of the district court and hold that New Jersey's Daniel's Law violates the First Amendment because it is not sufficiently tailored to the state's interest in protecting the safety of public officers in the judicial system.

Dated: April 28, 2025

HUDSON COOK, LLP

<u>*/s/ Jennifer L. Sarvadi*</u>
Jennifer L. Sarvadi
Robert Tilley (*admission pending*)
1909 K Street, N.W., 4th Floor
Washington, D.C. 20006
(202) 715-2002
jsarvadi@hudco.com

*Counsel for Amici Curiae*
*Consumer Data Industry*
*Association, Software & Information*
*Industry Association, and Coalition*
*for Sensible Public Records Access*

## **CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because: this brief contains 5,158 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

3.    This brief complies with the Court's rules and identical to one another and the electronic PDF version.

4.    Adobe Acrobat detection program has been run on the file and that no virus was detected.


_____ /s/ *Jennifer L. Sarvadi* _____

Jennifer L. Sarvadi

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April 2025, I electronically filed the foregoing Brief of Amici Curiae Consumer Data Industry Association, Software & Information Industry Association and Coalition for Sensible Public Record Access in Support of Appellants' Appeal with the Clerk of this Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished using the CM/ECF system.

HUDSON COOK, LLP

By  */s/ Jennifer L. Sarvadi*
     Jennifer L. Sarvadi

*Counsel for Amici Curiae*
*Consumer Data Industry*
*Association, Software & Information*
*Industry Association, and Coalition*
*for Sensible Public Records Access*